**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE, DIVISION**

In re:

SREEDHAR NUNNA                                      Case No. 3:13-bk-05379-JAF

and ROJA NUNNA

     Debtors                                                    Chapter 7

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case is before the Court upon the Acting United States Trustee's (the "UST") Motion to Dismiss Pursuant to 11 U.S.C. Sections 707(b)(1) and 707(b)(3) and Request for Clerk to Hold Discharge Pending Hearing (the "Motion"). (Doc. 42). The Court held a hearing on the Motion, after which the parties filed a Joint Stipulation on the Motion (the "Joint Stipulation"). (Doc. 54). Subsequently, the UST filed its Brief in Support of the Motion (the "UST's Brief"), to which Sreedhar Nunna and Roja Nunna, Debtors, filed an Amended Brief in Support of Debtors' Opposition to the Motion ("Debtors' Brief"). (Docs. 56, 58). Upon the evidence and the applicable law, the Court makes the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

On September 4, 2013, Debtors filed a petition in this Court for relief under Chapter 7 of the Bankruptcy Code with their accompanying Schedules. (Doc. 1). At the time they filed their petition, Debtors reported total assets of $330,105.00, versus total liabilities of $486,760.37. (Doc. 1 at 10). Debtors' most significant asset, in terms of value, is their residence valued at $220,000.00. (Doc. 1 at 12). Other assets include vacant land located at NW 1/4 of Sec. 33, Township 5 South, Range 21 East, Bradford County, Florida (the "vacant land in Bradford

County") valued at $40,000.00; vacant land located at County Road 229, Stark, Bradford County, Florida (the "vacant land in Starke") valued at $55,000.00; $475 in a Compass Bank checking account; $350 in a Bank of America checking account; household goods and furnishings valued at $1,230; hobby, and sports equipment valued at $50; and a 2008 Nissan Quest valued at $13,000.00. (Doc. 1 at 12-15).

With respect to liabilities, Debtors reported secured debt in the amount of $393,787.37 and unsecured debt in the amount of $92,973.00. (Doc. 1 at 10). The secured debt primarily represents three mortgages encumbering Debtors' residence: a $144,026.00 Bank of America mortgage, a $101,782.00 Compass Bank mortgage, and a $36,091.00 Compass Bank mortgage. (Doc. 1 at 18-19). Debtors intend to retain their residence and reaffirm the $144,026.00 Bank of America mortgage and the $101,782.00 Compass Bank mortgage. (Doc. 1 at 38-40). However, by judgment dated January 14, 2014, Debtors stripped off the $36,091.00 Compass Bank mortgage. (Doc. 1 at 38-40).

In addition, Debtors have a $34,979.37 Capital City Bank mortgage encumbering the vacant land in Bradford County, a $70,000.00 "Coastline Federal Cred" mortgage encumbering the vacant land in Stark, and a $6,909.00 lien encumbering their 2008 Nissan Quest. (Doc. 1 at 18-19). Debtors intend to surrender both the vacant land in Stark and the vacant land in Bradford County. (Doc. 1 at 12). Debtors intend to retain their 2008 Nissan Quest and reaffirm the secured lien. (Doc. 1 at 39).

Debtors' $92,973.00 unsecured debt consists of the following: $62,973.00 in credit card debt and $30,000.00 in a personal loan. (Doc. 1 at 21-22). Debtors also lease a 2012 Mercedes C250 for $830.00 monthly; this account was opened on May 1, 2012. (Doc. 1 at 15, 23, 27). Pursuant to the Joint Stipulation, a substantial portion of Debtors' debt stems from a failed real

estate business venture with friends, who subsequently filed bankruptcies, leaving Debtors to shoulder the debt alone. (Doc. 54 ¶ 7). It is unclear as to whether this failed real estate business venture affected Debtors' secured debt, unsecured debt, or both.

Shreedhar Nunna ("Mr. Nunna") is in his early forties and has stable employment as a computer programmer at NTT Data, Inc. (Doc. 54 ¶¶ 8, 10). The parties stipulated that as of the deposition date, January 15, 2014, Mr. Nunna earned from his employment approximately $12,012.35 per month[1] (Doc. 54 at ¶ 13). Roja Noona is a housewife and has no income. (Doc. 1 at 25). Debtors reported that their combined income 1) in 2011 was $107,166.00, 2) in 2012 was $114,640.00, and 3) in 2013, as of petition date, was $92,244.50. (Doc. 1 at 30). From their monthly income, Debtors reported $4,806.13 in monthly payroll deductions including: (1) $592.19 to repay a 401(k) loan; and (2) a $1,801.84 monthly contribution to a 401(k) account. (Doc. 1 at 25-26). After accounting for their deductions, Debtors represented a net monthly income of $7,206.22. (Doc. 1 at 25).

Against their income, Debtors claimed $7,395.00 in necessary, monthly expenses, resulting in a shortfall of $188.78 in Debtors' monthly budget. (Doc. 1 at 27). The expenses included, but were not limited to the following itemized expenditures:

$1,050    for rent or home mortgage payment[2]

$275      electricity and heating fuel

$200      water and sewer

$200      telephone

---

[1] Pursuant to the Joint Stipulation, approximately $8,018.14 of this amount is attributed to a base salary with the balance resulting from overtime. (Doc. 54 at ¶ 13). It is unclear as to why Debtors' original Schedule I indicates Mr. Nunna is making $0 monthly from overtime. (Doc. 1 at 25).

[2] On their original Schedule J, Debtors indicated that this amount does not include real estate taxes or property insurance. (Doc. 1 at 27). However, on their B22A Form, Debtors represented that this amount includes "taxes or insurance." (Doc. 1 52). The Court is unable to reconcile these inconsistencies.

| $100 | cable |
|---|---|
| $200 | other utilities |
| $300 | home maintenance |
| $1,400 | food |
| $350 | clothing |
| $100 | laundry and dry cleaning |
| $400 | medical and dental expenses[3] |
| $550 | transportation |
| $200 | recreation, clubs and entertainment, newspapers, magazines |
| $300 | charitable contributions |
| $50 | life insurance (not deducted from wages) |
| $180 | auto insurance |
| $830 | auto lease payment |
| $260 | second mortgage |
| $450 | other expenses including: 1) $100 school expenses, 2) $250 miscellaneous personal expenses, and 3) $100 lunches. |

(Doc. 1 at 27-28). On October 23, 2013, Debtors filed amended Schedules B and C. (Doc. 19). In their amended Schedules B and C, Debtors indicate that Mr. Nunna has $210,000.00[4] in an exempt 401(k) account. (Doc. 19 at 3, 6).

Debtors support a three-year-old daughter and a nine-year-old son and a sixty-year-old mother "who does not work outside the home." (Doc. 54 ¶ 9). Debtors did not specify whether

---

[3] In addition to listing $400 for medical and dental expenses, Debtors reported that Mr. Nunna takes a monthly payroll deduction of $180.55 for a health savings account used for purposes of paying medical bills. (Doc. 1 at 26).
[4] Pursuant to the Joint Stipulation, the present balance of Mr. Nunna's 401(k) account is approximately $238,060.98. (Doc. 54 ¶ 11).

the sixty-year-old mother receives any income from any source or the reason they subsidize her. After filing their petition, Debtors entered into a compromise with the Chapter 7 Trustee for payment to the estate of $5,000.00 plus a pro-rated portion of the 2013 tax refund. (Doc. 54 ¶ 4). Thereafter, the UST filed the Motion and conducted a deposition of Debtors. (Doc. 54 at ¶¶ 3, 5). As mentioned before, as of the deposition date, January 15, 2014, Mr. Nunna earned approximately $12,012.35 per month. (Doc. 54 ¶ 13). The parties stipulated that for the last several years, Mr. Nunna has contributed the maximum amount to his 401(k) plan. (Doc. 54 ¶ 11). At the present time, that amount is $17,500[5] per year, but the maximum varies somewhat from year to year. (Doc. 54 ¶ 11). The present balance of Mr. Nunna's 401(k) plan is approximately $238,060.98. (Doc. 54 ¶ 11). Mr. Nunna stated that he would need to cut back on his overtime for "health and family reasons." (Doc. 54 ¶ 13). Despite the anticipated reduction in Mr. Nunna's income, Debtors intend to continue contributing to Mr. Nunna's 401(k) plan at the statutory maximum.[6] (Doc. 54 ¶ 14). Debtors intended to accomplish that by cutting back on expenses. (Doc. 54 ¶ 14). On March 13, 2014, Debtors filed their amended Schedules I and J wherein they indicated they now have a negative monthly net income of $1,513.26. (Doc. 55 at 4). A comparison of Debtors' schedules filed on the petition date and on March 13, 2014, disclosed that Debtors did not cut back on any of their expenses. (Doc. 55 at 4, Doc. 1 at 27). Instead, it stands to reason that Mr. Nunna ceased to work overtime and reduced his average monthly income of $12,012.35 to his base pay of $8,018.14; Debtors still manifest a desire to maintain their pre-bankruptcy filing standard of living. (Doc. 54 ¶ 13, Doc. 55 at 2-5).

---

[5] Debtors' original Schedule I filed on September 4, 2013, indicated Mr. Nunna was making a $1,801.84 monthly contribution to his 401(k) account. (Doc. 1 at 26). If Mr. Nunna continued to make such monthly contributions he would exceed the statutory maximum by contributing $21,622.08 per year. Debtors do not explain why Mr. Nunna's monthly contributions were so high.

[6] Debtors' amended Schedule I filed on Mach 13, 2014, disclosed Mr. Nunna now contributes $1,292.92 per month to his 401(k) account. (Doc. 55 at 3). If Mr. Nunna continues to make such monthly contributions he will contribute $15,515.04 per year. The Court will however rely on the parties' Joint Stipulation, which established Mr. Nunna intends to contribute $17,500 per year to his 401(k) account. (Doc. 54 ¶ 11). .

In the Motion, the UST argues that the case is abusive under the totality of circumstances because Mr. Nunna could redirect his substantial 401(k) contributions and loan repayments to pay 100% of Debtors' unsecured debt in the context of a Chapter 13 plan. (Doc. 42 at 3-5). In his Brief in Support of the Motion, the UST observed that the 401(k) loan reflected on Debtors' original Schedule is paid in full. (Doc. 56 at 3). Debtors do not dispute the fact that they paid the 401(k) loan in full; in fact, they completely ignore the UST's assertion. Thus, for purposes of the Motion, the Court finds that the 401(k) loan is paid in full and that Mr. Nunna will not have a monthly payroll deduction of $592.19 to repay the 401(k) loan.

**Conclusions of Law**

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007). "In enacting the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress made sweeping changes to the Bankruptcy Code to address perceived abuses of the bankruptcy system and to ensure that debtors with the ability to repay their debts do so." In re Norwood-Hill, 403 B.R. 905, 907-08 (Bankr. M.D. Fla. 2009). "In a Chapter 7 proceeding, an individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets." Schultz v. U.S., 529 F.3d 343, 346 (6th Cir. 2008). However, it is well-established that a debtor has no constitutionally protected right to receive a discharge in bankruptcy. In re Jacob, 447 B.R. 535, 538 (Bankr. N.D. Ohio 2010) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)); U.S. v. Kras, 409 U.S. 434, 445–46 (1973)); see also In re Egebjerg, 574 F.3d 1045, 1048 (9th Cir. 2009) ("There is now no presumption favoring Chapter 7 relief, but an emphasis on repaying creditors as much as possible."). Discharge "is, instead, a legislatively created benefit that Congress may withhold at

its discretion." In re Jacob, 447 B.R. at 538. "To that end, Congress has prescribed conditions under which a debtor's bankruptcy case must be dismissed." Id. When Chapter 7 relief is sought, the conditions mandating dismissal are set forth in § 707.

Here, the UST relies on § 707(b)(3)(B), wherein Congress enacted a subjective test for determining whether "the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse." § 707(b)(3)(B); see also In re Kulakowski, 735 F.3d 1296, 1299 (11th Cir. 2013) ("In keeping with the underlying aim of the Bankruptcy Code, § 707(b) focuses on the purpose of Chapter 7 relief under the  . . . Code, primarily the issue of whether the petitioner is the honest and needy consumer debtor the Code was intended to protect.") (internal quotations omitted). The Code, does not define "totality of the circumstances," and bankruptcy courts have considerable discretion in determining whether dismissal for abuse is appropriate under this provision. In re Kulakowski, 735 F.3d at 1298-99. Generally speaking, the core inquiry of the totality of the circumstances test is whether a debtor has a meaningful ability to repay the unsecured debts. In re Dowleyne, 400 B.R. 840, 843 (Bankr. M.D. Fla. 2008). Other factors the Court may consider to the extent they are helpful include: 1) whether unforeseen or catastrophic events such as sudden illness, disability, or unemployment propelled the debtor into bankruptcy; 2) whether the debtor's standard of living has substantially improved as a result of the bankruptcy filing or essentially remained the same; 3) the debtor's age, health, dependents, and other family responsibilities; 4) the debtor's eligibility for Chapter 13 relief and whether creditors would receive meaningful distribution in a Chapter 13 case; 5) the age of the debts for which the debtor seeks a discharge and the period over which they were incurred; 6) whether the debtor incurred cash advances and made

consumer purchases far in excess of the ability to repay; 7) whether the debtor made any payments toward the debts or attempted to negotiate with her creditors; 8) the accuracy of the debtor's schedules and statement of current income and expenses; 9) whether the debtor filed the petition in good faith. In re Norwood-Hill, 403 B.R. 905, 912-13 (Bankr. M.D. Fla. 2009). Courts are not limited to considering the debtor's financial situation only as it existed on the day the petition was filed, but may, and indeed must, consider the debtor's financial situation at the time the motion to dismiss is heard. In re Pennington, 348 B.R. 647, 651 (Bankr. D. Del. 2006).

It should also be noted that "[a] totality of [the] circumstances inquiry is equitable in nature . . . ." In re Fitzgerald, 418 B.R. 778, 784 (Bankr. D. Conn. 2009) (internal quotations omitted). "It follows that both Chapter 7 of the Code and § 707(b) should be applied with the aim of effectuating justness and equity." In re Kulakowski, 735 F.3d at 1301. Such an inquiry cannot be reduced to the mechanical application of mathematical formulae but requires consideration of all relevant circumstances. In re Fitzgerald, 418 B.R. at 784.

The UST seeks dismissal of Debtors' Chapter 7 case and claims that Mr. Nunna's contributions to his 401(k) account cross the line of appropriateness because he proposes to continue amassing retirement savings at the statutory maximum rate of $17,500 per year plus his return on the investment while discharging all of Debtors' unsecured debts. Accordingly, the UST argues the sole issue presented in this case is whether the case is abusive under the totality of the circumstances due to the circumstances surrounding Mr. Nunna's 401(k) contributions.

Since the enactment of BAPCPA, several bankruptcy courts have addressed the issue of whether a debtor's 401(k) contributions should be excluded from the ability to pay analysis for purposes of determining if a Chapter 7 bankruptcy filing is abusive under the totality of the circumstances. One line of cases adopts the position that 401(k) contributions and 401(k) loan

repayments[7] are not necessary for the maintenance and support of the debtor and therefore should be included in the debtor's ability to pay analysis. See e.g. In re Zaporski, 366 B.R. 758 (Bankr. E.D. Mich. 2007); In re Jacob, 447 B.R. 535 (Bankr. N.D. Ohio 2010); In re Burton, 379 B.R. 732 (Bankr. N.D. Ohio 2007); In re Parada, 391 B.R. 492 (Bankr. S.D. Fla. 2008); In re Dowleyne, 400 B.R. 840 (Bankr. M.D. Fla. 2008); In re Southwick, Case No. 6:11-bk-17593-ABB (Bankr. M.D. Fla. Nov. 8, 2012); In re Williams, Case No. 3:12-bk-4856-PMG (Bankr. M.D. Fla. Sept. 23, 2013); In re Clary, No. 6:11–bk–04556–ABB, 2012 WL 868717 (Bankr. M.D. Fla. Mar. 14, 2012). A separate line of cases allows deducting 401(k) contributions in a Chapter 7 case once other factors militate against dismissal. In re Lavin, 424 B.R. 558 (Bankr. M.D. Fla. 2010); In re Norwood-Hill, 403 B.R. 905 (Bankr. M.D. Fla. 2009).

Debtors argue that the UST's Motion should be denied because if this case were converted to Chapter 13, Mr. Nunna would be able to continue making his 401(k) contributions because retirement account contributions do not constitute disposable income in a Chapter 13 case. In this instance, under the provisions of Chapter 13, Debtors would pay no more to unsecured creditors than they are going to pay to the Chapter 7 trustee under the approved compromise i.e. $5.000. Debtors argue that Mr. Nunna's diligent contributions to his retirement savings should not deprive Debtors of a fresh start. Debtors rely heavily on the Court's previous decision In re Garrett, Case No. 07-3997, 2008 WL 6049236 (Bankr. M.D. Fla. Jan. 18, 2008). In In re Garrett, the Court held that based upon the addition of §§ 541(b)(7) and 1322(f) to the Bankruptcy Code, retirement account contributions and the repayment of a loan secured by a retirement account do not constitute disposable income in a Chapter 13 case. 2008 WL 6049236 at *1. However, in In re Tauter, 402 B.R. 903 (Bankr. M.D. Fla. 2009), the Court held that the

---

[7] "[R]epayment on a 401(k) loan is the equivalent of a contribution." In re Burton, 379 B.R. 732, 737 (Bankr. N.D. Ohio 2007).

reasoning from In re Garrett does not apply in a Chapter 7 case. Specifically, the Court held as follows:

> Debtor argues that the Court's decision in In re Garrett, 07–3997 (January 18, 2008) permits a reduction in disposable income for both the TSP contribution and the TSP loan repayment. In Garrett the Court held that based upon the addition of §§ 541(b)(7) and 1322(f) to the Bankruptcy Code, retirement account contributions and the repayment of a loan secured by a retirement account do not constitute disposable income in a Chapter 13 case. The Court holds that Garrett does not apply in a Chapter 7 case. With respect to retirement account contributions, § 541(b)(7) clearly provides that contributions withheld from an employee's wages constitute property of the estate but do not constitute disposable income as defined in § 1325(b)(2). As to a TSP loan repayment, it is telling that Congress did not provide special treatment for qualified retirement plan loan repayments in the Chapter 7 means test calculation. See In re Whitaker, 2007 WL 2156397 (Bankr. N.D. Ohio July 25, 2007). A court must presume that Congress intentionally failed to incorporate §§ 362(b)(19) and 1322 into the means test. In re Barraza, 346 B.R. 724, 731 (Bankr. N.D. Tex. 2006).

In re Tauter, 402 B.R. 906. The Court has previously found that an individual's particular circumstances in a Chapter 7 case could warrant permitting a debtor to expense voluntary payments being made to retirement accounts against her "disposable income." In re Norwood-Hill, 403 B.R. at 912-13. The circumstances of this case, however, cannot be said to permit such deductions. Mr. Nunna is not near retirement age. He is young, has a stable, professional job, and hopefully, will have many years of gainful employment to work towards retirement. Although, Mr. Nunna historically has worked very long hours at his job, there is no indication he has a serious health issue. Moreover, Mr. Nunna has already amassed substantial equity in his 401(k) account, $238,060.98, which amount is more than double the amount of unsecured debt; there is no evidence of an imminent retirement such that Mr. Nunna will need to draw on his retirement savings in the foreseeable future. Debtors point to no factors militating against dismissal.

Instead, Debtors urge the Court to deny the UST's Motion and claim that under a Chapter 13 Mr. Nunna would be able to continue to contribute to the 401(k) account because the

retirement account contributions do not constitute disposable income in a Chapter 13 case. While this might be true, in order to receive a discharge in Chapter 13, Debtors would have to propose a plan in good faith. 11 U.S.C. § 1325(a)(3)[8]. Furthermore, if the statutory standard is to mean anything, the Court must consider and weigh all of the relevant factors, in addition to Debtors' mathematical ability to pay. See In re Lavin, 424 B.R. at 561.

Debtors' petition was not filed as a result of any sudden illness, calamity, disability or unemployment. The parties stipulated that Debtors filed their petition because of a failed business venture. Nevertheless, the Court notes that a great majority of Debtors' unsecured debts stems from the use of their credit cards. The parties presented no evidence establishing that Debtors' business obligations contributed or caused them to incur credit card debt. Of importance is the fact that Mr. Nunna worked long hours to generate more income. Mr. Nunna, however, chose to reduce his hours after the UST filed the Motion.[9] Although, the UST does not dispute Mr. Nunna cut back on his overtime "due to health and family reasons," the Court finds

---

[8] Section 1325(a)(3) states that "the court shall confirm a plan if— . . . the plan has been proposed in good faith and not by any means forbidden by law . . . ." This is a mandatory requirement. See Shaw v. Aurgroup Fin. Credit Union, 552 F.3d 447, 455-57 (6th Cir. 2009).

[9] The Motion was filed on December 5, 2013. (Doc. 42). As mentioned before, as of the deposition date, January 15, 2014, Mr. Nunna "earned approximately $12,012.35 per month [; . . .] $8,018.14 of this amount [was] attributed to base salary with the balance resulting from overtime." (Doc. 54 ¶ 13). Debtors filed their amended schedules on March 13, 2014, and reported that Mr. Nunna decreased his gross income to $8,018.14 by cutting out overtime in its entirety. (Doc. 55 at 2). The Court analyzed Mr. Nunna's gross wages between March of 2013 and August of 2013, a six-month period before the filing of the petition as reported on Debtors' original schedules, and observed that it varies substantially from month to month. Debtors reported the following current monthly income details for Mr. Nunna:

| | |
|---|---|
| 03/2013 | $10,149.41 |
| 04/2013 | $10,328.25 |
| 05/2013 | $16,065.47 |
| 06/2013 | $13,566.23 |
| 07/2013 | $8,354.21 |
| 08/2013 | $7,401.36 |

(Doc. 1 at 55). It is undisputed that a significant portion of Mr. Nunna's income stems from working overtime. Debtors did not indicate whether there is a quota for a number of overtime hours or if Mr. Nunna's ability to work overtime is otherwise limited in any way. Instead, it stands to reason, Mr. Nunna's income from overtime depends on his willingness to work overtime.

such conduct to be very problematic. Anytime, subsequent to the filing of a motion to dismiss, a debtor seeking a discharge lowers his or her income by taking an unpaid leave of absence, quitting a job, or refusing overtime formerly welcomed, it raises suspicion. See e.g, In re Vansickel, 309 B.R. 189, 212 (Bankr. E.D. Va. 2004) ("A debtor ought not be able to avoid his obligations to his creditors by voluntarily being underemployed or by manipulating his overtime or part-time employment."). Additionally, the Court must examine whether Debtors' proposed family budget is excessive or unreasonable.

The determination of whether a family budget is excessive or unreasonable is an "unenviable task." In re Johnson, 241 B.R. 394, 398 (Bankr. E.D. Tex. 1999) (determining what constitutes disposable income under 11 U.S.C. § 1325(b)). There is no bright-line rule for determining what is "reasonably necessary." In re Nicola, 244 B.R. 795, 797 (Bankr. N.D. Ill. 2000) (internal quotations omitted). A court should not superimpose its values and substitute its judgment for those of the debtor on basic choices about appropriate maintenance and support. In re Navarro, 83 B.R. 348, 355 (Bankr. E.D. Pa. 1988). The Court finds that this logic equally applies for purposes of § 707(b)(3). See e.g., In re Roppo, 442 B.R. 888, 894 (Bankr. N.D. Ill. 2010). A court should, however, substitute its judgment for that of the debtor when any one of the following additional factors is present: (1) the debtor proposes to use income for luxury goods or services; (2) the debtor proposes to commit a clearly excessive amount to non-luxury goods or services; (3) the debtor proposes to retain a clearly excessive amount of income for discretionary purposes; (4) the debtor proposes expenditures that would not be made but for a desire to avoid payments to unsecured creditors; and (5) the debtor's proposed expenditures as a whole appear to be deliberately inflated and unreasonable. Id. at 894–95.

It is helpful to compare Debtors' amended Schedule J expense line items (Doc. 55) with the relevant IRS National and Local Standards used in the means test because those standards establish bench marks to determine whether Debtors' budget is excessive. The IRS Local Standards for rent or mortgage housing and utilities for a family of five living in St. Johns County, Florida is $1,895. http://www.justice.gov/ust/eo/bapcpa/20130501/bci_data/housing_charts/irs_housing_charts_FL.htm. Housing and utilities standards include mortgage or rent, property taxes, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, residential telephone service, cell phone service, cable television, and internet service. http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Florida-Local-Standards-Housing-and-Utilities. On Debtors' amended Schedule J those monthly costs total $2,585. (Doc. 55 at 4). The IRS Transportation Standards for taxpayers with a vehicle consist of two parts: nationwide figures for monthly loan or lease payments referred to as ownership costs, and additional amounts for monthly operating costs. http://www.justice.gov/ust/eo/bapcpa/20130501/meanstesting.htm. The operating costs include maintenance, repairs, insurance, fuel, registrations, licenses, inspections, parking and tolls. http://www.justice.gov/ust/eo/bapcpa/20130501/meanstesting.htm. The Transportation Expense Standards for the ownership costs for a first and second car is $517 each per month or $1034 total. Debtors have a 2008 Nissan Quest securing a loan in the amount of $6,909 and they pay $128.80 monthly[10] in installments payments; they, also lease a 2012 Mercedes for $830 monthly. Even though Debtors' monthly ownership costs do not exceed $1034, the Court must note

---

[10] Debtors' amended Schedule J indicates that Debtors pay $0 in installment payments on their car even though it secures a debt in the amount of $6,909. (Doc. 1 at 27). Debtors' B22A Form indicates that Debtors' average monthly payment is $128.80 monthly. (Doc. 1 at 50). The Court finds that they are paying $128.80 monthly to repay their car loan.

Debtors' ownership costs for the 2012 Mercedes grossly exceed IRS ownership costs standards for one car. http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Local-Standards-Transportation. The standard operating costs for two cars in the South Region total $488; Debtors' amended Schedule J operating costs expenses total $550. In addition, the IRS National Standards for Food, Clothing and Other Items (housekeeping supplies, apparel and services, personal care products and services, and miscellaneous) for a five-person family total $1746 per month. http://www.justice.gov/ust/eo/bapcpa/20130501/meanstesting.htm). Debtors' amended Schedule J lists the following expenses: food $1,400; clothing $350; laundry and dry cleaning $100; recreation, clubs and entertainment $200; school expenses/activities $100; miscellaneous personal expenses $250; and lunches $100 for a total of $2,500. (Doc. 55 4-5). The standard out of packet health care expenses for a family of five whose members are under 65 total $300 while Debtors listed $400.[11] (Doc. 55 at 4; http://www.justice.gov/ust/eo/bapcpa/20130501/meanstesting.htm).

Thus, in virtually every category Debtors' monthly expenses are higher than the applicable standards. The Court finds that Debtors propose to commit a clearly excessive amount of income for non-luxury goods and services and to retain a clearly excessive amount of income for discretionary purposes. The Court therefore concludes that Debtors and their family are still living an above-standard lifestyle and have not significantly tightened their financial spending habits, notwithstanding their filing bankruptcy. In re Crink, 402 B.R. 159, 171 (Bankr. M.D.N.C. 2009) (stating that a debtor's budget may be excessive or unreasonable because of

---

[11] Pursuant to IRS guidelines, taxpayers and their dependents are allowed the standard amount monthly on a per person basis, without questioning the amounts they actually spend. http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/National-Standards-Out-of-Pocket-Health-Care. If the amount claimed is more than the total allowed by the health care standards, the taxpayer must provide documentation to substantiate those expenses are necessary living expenses. http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/National-Standards-Out-of-Pocket-Health-Care. Here, Debtors failed to provide any information that would explain the reason they must incur medical expenses, which amount is more than the total allowed by the health care standards.

14

high housing expenses). No family in this District needs a lifestyle which is more expensive than necessary to the detriment of its unsecured creditors. Moreover, Mr. Nunna wants to contribute the statutory maximum to his 401(k) account. Consequently, the Court finds that the Debtors' financial situation demonstrates abuse. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

DATED this 13 day of May, 2014 in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge